## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

HARRY B.,

                                     Plaintiff,

        v.                                            3:20-CV-227
                                                       (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                      Defendant.

PETER A. GORTON, ESQ., for Plaintiff
SEAN SANTEN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

### MEMORANDUM-DECISION AND ORDER

      This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 4, 7).

## I.    PROCEDURAL HISTORY

      On June 13, 2017, plaintiff protectively filed an application for Disability Insurance Benefits ("DIB"), alleging that he became disabled on February 17, 2016 due to due to chronic back pain, herniated disc, fractured vertebra, slight depression, and nerve damage in his back and legs. (Administrative Transcript ("T") 82, 174-80, 246).  His application was denied initially on September 13, 2017. (T. 94)  Plaintiff requested a hearing, which was commenced on January 11, 2019 before Administrative Law Judge ("ALJ") David

Romeo but was postponed until May 8, 2019 so that plaintiff could obtain counsel. (T. 45-47, 50-81).  ALJ Romeo issued an unfavorable decision on May 16, 2019 (T. 15-28), which became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on February 3, 2020 (T. 1-5).

## II.   GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering his
> age, education, and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy, regardless of whether
> such work exists in the immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he would be hire if he
> applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner] next
> considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work activities.

2

> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole

record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   FACTS

Plaintiff was born on June 11, 1986 and was a month away from his 33rd birthday at the time of the administrative hearing. (T. 52).  He lived in a mobile home with his wife and three children, aged 12, 7, and 9 months. (T. 52, 64).  At the time of the administrative hearing, plaintiff's wife had been out of work for two months on "temporary disability," due to an injury she sustained at her job. (T. 53).  Plaintiff started high school but did not graduate and did not obtain a General Equivalency Diploma

("GED").[1] (T. 55).  Plaintiff told the ALJ that he had a driver's license, and that he drove four or five times per week to go to the store or to pick up his children. (T. 54).  Plaintiff testified that approximately three to four times per month, his pain was so bad that he was not able to drive at all. (T. 54-55).

Plaintiff had prior work experience as a Walmart stocker, cart pusher, and a landscaper. (T. 55-56).  His last job was at Walmart in 2016, and plaintiff stated that his doctor took him out of work because his back pain prevented him from performing the functions required by his job. (T. 56).  He tried to go back to work but had to stop the same day. (*Id.*)  Plaintiff testified that he was told that he could not return to Walmart, even as a "door greeter." (T. 57).

Plaintiff testified that he would not be able to work full-time because he was always in pain and must constantly shift positions. (T. 57).  The pain was so intense that it affected the plaintiff's concentration, caused him to sweat, and caused him to become dizzy. (T. 57-58).  Plaintiff stated that the pain varied from day to day, that he never had a pain-free day, and he generally had trouble walking and bending. (T. 58-59).  Some days, he was able to get up, shower, and walk around, but approximately three or four times per month, he suffered from excruciating pain that would cause him to either sit or lie down. (T. 59).

---

[1] Plaintiff later testified that he was in "special classes" while he was in school for as long as he could remember. (T. 63).

Plaintiff testified that he saw two treating physicians, Dr. Sanjeev Patel, M.D., who referred him to pain specialist, Dr. Anne Calkins, M.D. (T. 59-60). Plaintiff saw Dr. Patel four times per year since he stopped working in February or March of 2016, and he saw Dr. Calkins two to three times per year, depending on the degree of plaintiff's pain. (T. 60). Plaintiff testified that he also suffered from high blood pressure and asthma. (T. 60-61). Plaintiff stated that he took medication for his back pain and his blood pressure, and he had an inhaler for the asthma. (T. 60-61). Plaintiff stated that he used his inhaler three times per month. (T. 61). Sometimes, when plaintiff was walking, the pain would "take [his] breath away," and he had to sit down and use the inhaler. (T. 61-62). Plaintiff also testified that the medication prescribed by Dr. Calkins made him drowsy. (T. 62).

Plaintiff testified that he could mow the lawn in "sections," but if anything needed to be picked up or moved around, plaintiff asked his 12-year old son to help him. (T. 64-65). Plaintiff and his wife went grocery shopping together. (T. 65). Plaintiff's wife picked everything up at the store unless the children were along, and then they took the items off the shelves and put them in the cart. (T. 65). Plaintiff testified that he could comfortably lift approximately 20 pounds, and the problem with lifting was that he had trouble "bending over." (T. 65). Plaintiff stated that he could lift his 9-month-old if plaintiff was in a seated position, when the child was "elevated," or if he was taking the child from someone else so that he could avoid bending over. (T. 65-66).

Plaintiff testified that on a good day, he could walk for 30 or 45 minutes before having to rest, but on a bad day, he used a walker to keep his balance. (T. 66). Plaintiff stated that he had been using the walker for approximately 8 months prior to the hearing,

and that Dr. Patel wrote the prescription for him. (T. 67).  Plaintiff stated that prior to using he walker, he used a cane to "help keep balance" since 2016. (T. 67).

Plaintiff testified that his wife did most of the cooking, but that he could cook if the food was on the stove and he did not have to bend over. (T. 67-68).  Plaintiff was able to load the top rack of the dishwasher, but the children had to load the bottom rack. (T. 68).  Plaintiff's wife did all the laundry. (T. 68).  Plaintiff could vacuum a small amount, but the forward and backward motion irritated his back. (*Id.*)  Plaintiff testified that he did not sleep very well because he was in constant pain even when lying down and would wake up approximately 10 times per night. (T. 68-69).

Plaintiff supervised the children getting ready for school and made sure they had breakfast. (T. 69).  Plaintiff was able to change the baby's diapers and could sit while feeding the baby. (T. 69).  Plaintiff testified that he took care of the baby after his wife gave birth to their youngest child and went back to work. (T. 70).  At the time of the ALJ's hearing, the baby was still teething, but plaintiff testified that his wife got out of bed when the baby woke up at night. (*Id.*)

Plaintiff testified that his older son participated in BMX racing, and his daughter was a cheerleader.  Plaintiff stated that he drove his children to practices and to competitions. (T. 70-71).  The BMX races were held all over the East Coast. (T. 71).  Plaintiff testified that their "home" track was Grippen Park in Endicott, New York, but that they occasionally went to Horseheads and once went to Maryland. (T. 71).  When the family traveled to Maryland, they stayed overnight. (*Id.*)  The family went on the trip in their minivan.  Plaintiff's wife and children loaded the minivan with the bicycles and race

gear. (T. 71-72).  Plaintiff testified that he only went to Maryland once, and if his children's sporting events occurred on one of plaintiff's "bad" days, he would have to miss the event. (T. 74).  Plaintiff's hobbies included playing Dungeons and Dragons ("DND") with friends. (T. 72).  Plaintiff stated that DND was a "role-playing" game that could be played on the computer, but that plaintiff also played live three times per month with a group of friends from high school. (T. 72).

The ALJ heard testimony from Vocational Expert ("VE") Robert Baker. (T. 74-80).  VE Baker testified that plaintiff's previous work as a cart attendant was medium work, while his job as a landscape laborer and his job as a stock clerk were both in the heavy exertional category. (T. 75).  The ALJ asked the VE to assume that an individual of plaintiff's age, education, and past work experience was limited to light work which involved only occasional operation of foot controls, occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. (T. 75-76).  The hypothetical individual could never climb ropes, ladders, or scaffolds.  He could never work in high "exposed" places or with moving mechanical parts. (T. 76).  He could occasionally be exposed to weather, extreme heat, extreme cold, wetness, humidity, vibration, and "atmospheric conditions."  The hypothetical individual could understand, remember, and carry out simple instructions and make simple, work-related decisions with "detailed but uninvolved tasks." (T. 76).  The individual could work at a consistent pace through the workday, but not at production rate pace where each task must be completed within a strict timeline, could tolerate occasional interaction with coworkers and supervisors, but could have no interaction with the public. (*Id.*)  He could tolerate

occasional changes in work schedule and would need to have the option of sitting for 10 minutes after every 60 minutes of standing or walking but could remain on task while sitting. (T. 76).

In response to this hypothetical question, VE Baker testified that the individual would not be able to perform plaintiff's prior work, but that he could perform other work which existed in significant numbers in the national economy. (T. 76-78).  The VE proposed three light jobs that the plaintiff could still perform with his additional restrictions: router, photocopy machine operator, and order caller. (T. 77).  The ALJ then modified the exertional level to sedentary and took out the sit/stand option. (T. 77).  The VE testified that there would still be jobs that plaintiff could perform. (T. 77-78).  The VE stated that the individual could perform the sedentary jobs of addresser, document preparer - microfilming; and cutter and paster - press clippings. (T. 78).

However, VE Baker testified that if the individual needed to rest for 15 minutes every hour, there would be no work that he could perform. (*Id.*)  VE Baker also stated that an employer would only tolerate a person being off task a maximum of 15% and would tolerate only one unexcused absence per month. (T. 78-79).  The VE also testified that the use of a walker was "an accommodation" and that generally, "it is not typical that an employer gives someone extra space to store a walker" when he or she is at a work station. (T. 79-80).

The parties have outlined the medical evidence in their briefs. (Dkt. No. 9 at 6-8; Dkt. No. 12 at 1-8).  Rather than summarizing the evidence and the medical records at the

outset, I will refer to the pertinent records during my discussion of the plaintiff's arguments.

## IV.   **THE ALJ'S DECISION**

The ALJ determined at step one, that plaintiff met the insured status requirement until December 31, 2021, and that plaintiff had not engaged in substantial gainful activity since December 21, 2016.[2]  The ALJ then found that plaintiff has the following severe impairments at step two of the sequential evaluation: lumbar degenerative disc disease, degenerative joint disease, bilateral lower extremity radiculopathy, asthma, obesity, and adjustment disorder with depressed mood. (T. 18).  At step three, the ALJ concluded that plaintiff did not have any impairments, alone or in combination, that met or equaled the severity of a listed impairment. (T. 18-20).  The ALJ considered Listings §§ 1.04 (Disorders of the Spine); 3.03 (Asthma); 11.14 (Peripheral Neuropathy); and 12.04 (Depressive, Bipolar, and Related Disorders). (*Id.*) (*See* 20 C.F.R. Pt. 404, Subpt. P, App.1 §§ 1.04, 3.03, 11.14, 12.04).

At step four of the sequential evaluation, the ALJ found that plaintiff had the RFC to perform light work, with several additional restrictions. (T. 20-21).  Plaintiff could

---

[2] Plaintiff is alleging disability beginning on February 17, 2016.  However, plaintiff filed a prior application for DIB on October 25, 2016, which was denied initially on December 20, 2016. (T. 15).  Plaintiff did not appeal the initial denial, and instead filed the current application within one year of the initial denial. (*Id.*)  According to the regulations, the ALJ was authorized to consider the current application as one for reopening, which the ALJ denied. (*Id.* at 15-16).  Thus, although the ALJ considered the evidence from prior to December 21, 2016, the relevant period for purposes of disability benefits begins on December 21, 2016, the day after the initial denial of the October 2016 application. (T. at 15).

occasionally operate foot controls, balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. (T. 20).  Plaintiff could never climb ropes, ladders, or scaffolds. (*Id.*)  He could never work in "high, exposed places," or with moving mechanical parts. (*Id.*)  Plaintiff could have occasional exposure to weather, extreme heat, extreme cold, wetness, humidity, vibrations, and atmospheric conditions. (*Id.*)  Plaintiff could understand, remember, and carry out simple instructions and make simple work-related decisions. (*Id.*)  He could work at a consistent pace throughout the day, but not at "production rate" where each task must be completed within a strict timeline. (*Id.*)  The plaintiff could tolerate occasional interaction with co-workers and supervisors, but no interaction with the public.  He could also tolerate occasional changes in the work setting.  Finally, the ALJ determined that the plaintiff would need to have the option to sit for 10 minutes after every 60 minutes of standing but could remain on task while sitting. (T. 20-21).

Based on this RFC and VE Baker's testimony, using the Medical-Vocational Guidelines only as a framework, the ALJ determined that plaintiff could not perform his past work, but that he could perform the representative jobs of router, photocopy machine operator, and order caller. (T. 27).  Thus, the ALJ found that plaintiff was not disabled from December 21, 2016 to the date of the ALJ's decision. (T. 28).

## V.   <u>ISSUES IN CONTENTION</u>

Plaintiff raises the following arguments in support of his position that the ALJ's decision is not supported by substantial evidence:

1.    The ALJ's "sit/stand" option was not supported by substantial evidence. (Pl's Br. at 9-13) (Dkt. No. 9).

2.      The ALJ's failure to include any "on task" or attendance limitations in the RFC was not supported by substantial evidence. (Pl.'s Br. at 13-17).

3.      The ALJ erred in failing to assess plaintiff's need to use a cane or a walker. (Pl.'s Br. at 17-18).

4.      The ALJ improperly weighed the medical opinions. (Pl.'s Br. at 18-23).

5.      The ALJ's step five determination was not supported by substantial evidence. (Pl.'s Br. at 23).

Defendant argues that the Commissioner's final decision is supported by substantial evidence, countering each of plaintiff's arguments. (Def.'s Br. at 9-25) (Dkt. No. 12).  Plaintiff filed a reply brief. (Dkt. No. 15).  For the reasons stated below, the court affirms the Commissioner's decision.

## VI.   RFC/WEIGHING EVIDENCE

### A.    Legal Standards

#### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations.  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y.

2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R.   §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions that plaintiff is capable of performing and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

## 2.    Evaluating Medical Evidence

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions;

this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* at §§ 404.1520c (a) and (b)(1), 416.920c(a) and (b)(1).  The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule.  *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853.  An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations

provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions are equally well supported and consistent with the record, but are not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id.* at §§ 404.1520c(b)(3), 416.920c(b)(3).

### B.    Analysis

Plaintiff makes various arguments which relate to the ALJ's RFC determination and may be considered together. Plaintiff argues that the ALJ improperly weighed the medical evidence and did not give appropriate deference to plaintiff's treating physicians, including their assessment of plaintiff's inability to stay on task and the possibility of unexcused absences, notwithstanding the change in the agency's regulations. Plaintiff argues that the ALJ's "sit/stand" determination is unsupported by substantial evidence and inconsistent with any of the medical evidence, particularly the Medical Source Statements ("MSS") submitted by Dr. Patel and Dr. Calkins. Plaintiff also argues that the ALJ erred in failing to assess plaintiff's use of a cane or walker when determining plaintiff's RFC.

### 1.     Use of Assistive Device

Plaintiff argues that the ALJ should have considered plaintiff's claim that he used a cane and/or a walker.  At the hearing, plaintiff testified that he had been using a walker for eight months. (T. 66-67).  Plaintiff testified that on a good day, he could walk for 30 to 45 minutes, but he used a walker on bad days. (T. 66).  Plaintiff testified that Dr. Patel gave him a prescription for the walker after plaintiff fell using the cane. (T. 67).

The ALJ did not include any such requirement in the RFC, although he did comment on plaintiff's statement that he needed an assistive device. (T. 23).  The ALJ reviewed Dr. Patel's treatment notes, which indicated on many occasions that plaintiff's gait and station were "normal," and that although plaintiff's lumbar spine range of motion was limited with pain, his muscle strength and tone were normal. (T. 23).  The ALJ also noted that Dr. Patel found that, the majority of the time, there was no sensory loss, and he noted no focal deficits. (T. 23).  Plaintiff's "straight leg raising" tests were positive on only two occasions, but neither test was confirmed in a seated position. (*Id.*)  The ALJ specifically stated that "Dr. Patel made no reference to claimant ambulating with an assistive device." (*Id.*)

The ALJ's decision to omit such a restriction is supported by substantial evidence in the record.  Most of the reports by treating physician, Dr. Patel, M.D.; pain specialist Dr. Anne Calkins, M.D.; and her co-worker, Dr. Aathirayen Thiyagarajah, M.D.[3] indicate

---

[3] The record indicates that plaintiff initially saw Dr. Thiyagarajah on March 5, 2018 when plaintiff was considering epidural injections. (T. 628).  When plaintiff decided that he did not wish to have the injections at that time, Dr. Thiyagarajah stated that he referred plaintiff to Dr. Calkins for further advice.

that plaintiff's gait and station were normal. (T. 405 (Patel), 608 (Patel), 616 (Calkins), 630 (Thiyagarajah), 642 (Calkins), 645 (Calkins), 649 (Thiyagarajah)).   Plaintiff's "Self-Function Reports," submitted to the agency on November 23, 2016 and again on August 3, 2017, did not indicate that he used a cane or a walker for ambulation. (T. 223, 265). Plaintiff checked only the box indicating that he wore "glasses," but left blank the boxes next to any of the other assistive devices listed, including cane and walker. (*Id.*)  On August 15, 2016, neurologist, Dr. Khalid Sethi, M.D. stated that plaintiff's gait and strength were both stable.[4] (T. 382).

The consultative report by Dr. Gilbert Jenouri, M.D., dated September 6, 2017, states that plaintiff's gait was antalgic,[5] that he used a cane "for pain **when outdoors**, prescribed by his physician," and that his gait improved with the cane, but then stated that plaintiff "used no assistive devices." (T. 570) (emphasis added).  The report seems to indicate that plaintiff used no assistive devices during the examination, and he was able to rise from a seated position without difficulty. (T. 570).  Dr. Jenouri's examination also stated that the plaintiff could walk on his toes and heels **without difficulty**. (T. 570) (emphasis added).  On the same day, Dr. Patel noted that plaintiff's gait and station were "normal."[6] (T. 608).  The court notes that on September 14, 2017, plaintiff had an

---

(T. 630).
[4] Dr. Sethi also stated that he believed the plaintiff could return to work in a "restricted" capacity with no heavy lifting, bending, twisting or axial loading activities greater than 15 pounds, no pushing or pulling with breaks as needed. (T. 382).
[5] Antalgic gait is "an abnormal pattern of walking secondary to pain, that ultimately causes a limp." https://www.ncbi.nlm.nih.gov/books/NBK559243/
[6] The court notes that on the same day (Sept. 6, 2017), plaintiff was consultatively examined for his

appointment with a Nurse Practitioner in Dr. Patel's office as a follow-up to an

emergency room visit due to chest pain. (T. 605).  Upon physical examination, it was

noted that plaintiff "ambulates with no devise [sic], steady." (T. 606).

     In *Fields v. Colvin*, No. 16-CV-6312, 2018 WL 271531, at *3 (W.D.N.Y.), the court

stated that, while the need to use an assistive device may impact an individual's ability to

perform the exertional requirements of work, there must be "medical documentation

establishing the need for a hand-held assistive device to aid in walking or standing, and

describing the circumstances for which it is needed." *Id.* (discussing assistive device

requirement in conjunction with "light work") (quoting Social Security Ruling ("SSR")

96-9p, 1996 WL 374185, at *7. (July 2, 1996)).[7] *See also Allen v. Commissioner of Soc.

Sec.*, No. 5:15-CV-1557 (DNH/ATB), 2016 WL 996381, at *8 (N.D.N.Y. Feb. 22, 2016);

*Hoke v. Colvin*, No. 1:14-CV-663 (GTS/CFH), 2015 WL 3901807 (N.D.N.Y. June 25,

2015); *Wilson v. Comm'r of Soc. Sec.*, No. 6:13-CV-643 (GLS/ESH), 2014 WL 4826757,

at *10-11 (N.D.N.Y. Sept. 29, 2014).  A cane or other assistive device need not be

prescribed to be considered medically necessary, but there must be specific medical

documentation establishing the need for it and the circumstances surrounding that need.

*Allen*, 2016 WL 996381, at *8 (citing *Hoke, supra*). The burden of proof is on the

plaintiff. *Wilson*, 2014 WL 4826757, at *11 (citing *Howze v. Barnhart*, 53 Fed. App'x

---

mental impairment by Dr. Amanda Slowik, who stated that plaintiff "used a cane to ambulate." (T. 563).
It appears that plaintiff had three doctors' appointments on September 6, 2017. (T. 562-66 (Dr. Slowik);
T. 570-72 (Dr. Jenouri); T. 607-609 (Dr. Patel)).

[7] SSR 96-9p refers to sedentary work, but the case law has applied the concept of medical necessity of
assistive devices to other exertional categories of work, including "light work." *See Fields, supra*

218, 222 (3d Cir.2002)).

In this case, there is no medical documentation that plaintiff was prescribed either a cane or a walker.  The fact that at times, plaintiff may have used a cane or assistive device, does not indicate that such a device was medically necessary.  An observation that plaintiff used such a device, even by medical personnel is not enough. *Hoke*, 2015 WL 3901807 at *14. *Cf. Feringa v. Comm'r of Soc. Sec.*, No. 5:15-CV-785 (LEK/CFH), 2016 WL 5417403, at *6 (N.D.N.Y. Sept. 9, 2016) (distinguishing a case in which, although no assistive device was prescribed, it was approved by various medical providers, including the consultative physician who found that the device was medically necessary).

In this case, the ALJ had substantial evidence in the record that plaintiff's gait, although sometimes antalgic, was more often normal (T. 323, 328, 333, 420, 501, 608, 616, 623, 630, 649).  Dr. Patel noted once that plaintiff walked with a walker, but never indicated that such a device was necessary or that he prescribed any kind of an assistive device.[8] (T. 596).  No other physician mentioned that plaintiff used a walker in his or her reports.[9] Thus, the ALJ's failure to include the use of an assistive device in the RFC was supported by substantial evidence, and given the medical evidence, plaintiff's occasional

_____

[8] The ALJ did err in stating that Dr. Patel "made no reference to the claimant ambulating with an assistive device." (T. 23).  It is unclear whether the ALJ was referring to a specific report.  On March 27, 2018, Dr. Patel stated that plaintiff "finds it difficult to ambulate he does ambulate with a walker." (T. 596).  However, if the ALJ did err, any such error is harmless because most of the doctors' reports did not mention an assistive device, and there is no prescription for an assistive device from Dr. Patel or any other provider in the record.

[9] As stated above, Dr. Jenouri stated that plaintiff told him that he used a cane when outdoors, prescribed by his physician. (T. 570).  But plaintiff was not using any assistive device during the examination and could walk on his toes and heels without difficulty. (*Id.*)

use of such a device does not prevent the performance of light work. *See Fields, supra.*

### 2.    Sit/Stand Option

Plaintiff argues that although the ALJ included a sit/stand option in his RFC, his choice of one hour standing with ten minutes of sitting, while remaining on task, was not supported by the record and was inconsistent with the medical opinions of both treating physicians.  Dr. Calkins's MSS stated that plaintiff could sit for 6 hours out of an 8-hour day and could stand for 2 hours out of an 8-hour day, but he must alternate positions every 15 minutes. (T. 657).  In his MSS, Dr. Patel found that plaintiff could sit and stand between 1-2 hours in an 8-hour day but must change positions "as much as possible." (T. 660).  Although plaintiff's argument regarding both the sit/stand option and the on-task/absentee opinions are separate from his discussion of the validity of the new regulations, these arguments both bear on the weight given to the treating physicians' opinions.  Thus, the court will address plaintiff's argument that the new regulations are invalid, and that the ALJ erred in weighing the evidence, notwithstanding the new regulations.

### a.  2017 Regulations

Plaintiff argues that the treating physicians' opinions should be given "deference," notwithstanding the new regulations which state that the Commissioner will not give "controlling weight" to any particular medical opinion.  Plaintiff argues that the Commissioner cannot change pre-existing case law which recognizes the priority of a treating physician's opinion.  This court finds that the ALJ properly weighed the medical evidence under either standard.

Even prior to the 2017 regulations, a treating physician's opinion was only given "controlling" weight if it was "consistent with other substantial evidence in the record." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). If the ALJ did not give the treating physician controlling weight, then the ALJ was required to consider the factors articulated in *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)). The factors in *Estrella* are similar to the factors in the Commissioner's new regulations, including "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.* Supportability and consistency are included in these factors, as well as the length of treating relationship. *Id. See* 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Consistency and supportability were as important under the previous regulations as they are in the new regulations because "consistency" with evidence in the record was always considered when determining whether "controlling" weight was going to be given to a treating physician's opinion, before any of the other factors were considered. The new regulations restate the factors which have always been used in considering any medical opinion. A treating physician's opinion may still be more persuasive because he or she will have examined the plaintiff more frequently and will presumably have a more substantial relationship with the patient. Thus, although there is no "special" deference specifically given, the treating relationship is one of the factors to be considered in the analysis under the new regulations.

Plaintiff argues that the new regulations are invalid.  Plaintiff also argues that the Second Circuit's decision in *Schisler v. Sullivan (Schisler III)*, 3 F.3d 563 (2d Cir. 1993), which upheld the 1991 amendments to the regulations affecting the analysis of medical opinion, was "questionable" or that the decision was limited to the specific regulation in that case. (Pl.'s Br. at 20-23).  Plaintiff argues that *Schisler III* is inconsistent with *Aguire v. INS*, 79 F.3d 315, 317 (2d Cir. 1996) which held that an agency's interpretation of the statutes it administers, though entitled to deference in some instances, cannot compel a court to "abandon stare decisis and abandon a construction previously made." *Id.* Plaintiff argues that the *Schisler* court upheld the 1991 Social Security regulation amendments because they were "reasonable." (Pl.'s Br. at 21-22).  Plaintiff argues that the 2017 amendments are no longer a "reasonable" interpretation of "prior case law and run afoul of the prior Second Circuit precedent . . . ." (*Id.*)

This court disagrees that the 2017 regulations are such a "radical" departure from existing law.  Plaintiff's attempt to distinguish *Schisler III* is unavailing.  The reasonableness of the agency's interpretation refers to its interpretation of the statute that it is administering, not the reasonableness of its interpretation of "prior case law." *Schisler III* held that new regulations were valid and binding even though they were at variance with prior court precedent. 3 F.3d at 568.  Plaintiff has not shown that the new regulations are so "arbitrary and capricious" as to be outside of the Commissioner's rule-making authority and therefore, not binding on the court. *See Harris v. Saul*, No. 19-CV-3715(NRN), 2021 WL 406080, at *4 (D. Colo. Feb. 5, 2021) (citing *Schisler*, 3 F.3d at 568).

22

As stated in *Schisler III*, 42 U.S.C. § 405(a) authorizes the Commissioner to issue regulations governing the disability program.[10] 3 F.3d at 567.  The Commissioner's authority to promulgate regulations governing "proofs and evidence" is "'exceptionally broad.'" *Id.* (quoting *Heckler v. Campbell*, 461 U.S. 458, 466 (1983)).  The regulations governing the weight of medical evidence in the determination of disability claims fall squarely into the scope of the grant of authority under section 405(a). *Id.*  Judicial review of these regulations is "narrow" and is limited to whether the regulations are arbitrary, capricious, or in excess of the authority granted, not whether they are "contrary" to judicial precedent. *Id.*

A review of the *Revisions to Rules Regarding the Evaluation of Medical Evidence*[11] shows that the Commissioner's regulations, although admittedly different that they have been since the last substantive revisions in 1991, are not arbitrary, capricious, nor are they outside of the Commissioner's "exceptionally broad" authority to administer the disability program.  The rationale for focusing more on the evidence itself than on the source of the evidence was, in part, based on the significant changes in the "health care

---

[10] 42 U.S.C. § 405(a) states that

> The Commissioner of Social Security shall have **full power and authority** to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt **reasonable and proper rules and regulations** to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.

*Id.* (emphasis added).

[11] This document contains a listing of comments to the new regulations, together with the agency's response to those comments and whether the comments were incorporated into the final regulations.

delivery system." 2017 WL 168819, at *5853.  Many individuals receive health care from multiple medical sources, and do not develop a sustained relationship with one provider. *Id.*  Many of these medical sources would not be considered "treating sources" under the regulations.  Thus, focusing on the content of the medical evidence, rather than on the source of the evidence is more equitable in such a situation.  In addition, the new regulation allows the consideration of all medical opinions regardless of whether the author is "an acceptable medical source" under the prior regulations, which also "reflects the realities of the current health care system in which many individuals are examined by Nurse Practitioners and Physicians Assistants, who would not have been acceptable medical sources under the old regulations. *Id.*

The agency responses to comments on the rules revisions also state that since 1991, the two most important factors for determining the persuasiveness of medical opinion have been consistency and supportability. *Id.*  One of the agency responses states that "[t]hese final rules . . . continue to allow an adjudicator to consider an individual's own medical source's medical opinion to be the most persuasive medical opinion if it is both supported by relevant objective medical evidence and the source's own explanation, and is consistent with the other evidence as described [in the regulations.]" *Id.* The statute gives the Commissioner broad discretion and does not state how evidence must be considered and does not provide for any particular hierarchy of medical opinion.  Thus,

plaintiff's challenge to the new regulations cannot succeed.[12]  However, the court must still determine whether the ALJ properly considered the evidence under the new regulations.

### b.  ALJ's Analysis

Turning to the ALJ's consideration of the evidence, the court notes that plaintiff did not begin seeing Dr. Calkins until April of 2018.[13]  (T. 651-53).  Her MSS is dated March 13, 2019 and states that the "time period" represented by the answers in the MSS is "***Jan. 3, 2019*** to indeterminate." (T. 657) (emphasis added).  Plaintiff has had a long-term relationship with his internist Dr. Patel.  However, Dr. Patel's MSS is dated April 5, 2019 and states that the "time period" represented by the answers in the MSS is "***April 5, 2019 to April 5, 2020***." (T. 660) (emphasis added).  Plaintiff is alleging a disability onset in February of 2016.  Thus, the ALJ was justified in looking to Dr. Patel's earlier contemporaneous treatment notes in conjunction with the opinion that he set forth in his MSS.

One of Dr. Patel's earlier reports, dated July 14, 2016, stated that plaintiff was unable to continuously bend or squat "or sit or stand more than one hour *at a time*." (T.

---

[12] In *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Svcs.*, 545 U.S. 967, 982-83 (2005), the Court held that a prior court decision "trumps" agency construction only if the prior court decision holds that its construction follows the "unambiguous terms" of the statute and leaves no room for agency discretion. There are no such "unambiguous" terms in the statute authorizing the promulgation of regulations under the Social Security Act. *See* 42 U.S.C. § 405(a).

[13] As stated above, on March 3, 2018, Dr. Thiyagarajah referred plaintiff to Dr. Calkins, and the first report by Dr. Calkins was dated April 13, 2018. (T. 651-53).  The April 13, 2018 examination was conducted by Timothy Leonard, FNP, with an "addendum" by Dr. Calkins. (*Id.*)  The first examination conducted by Dr. Calkins herself appears to be December 12, 2018. (T. 644-46).

421).  This is consistent with the ALJ's finding that plaintiff would need the option to sit for 10 minutes after standing or walking for 60 minutes.  While Dr. Patel noted in several reports that plaintiff stated that he could only stand or walk for minutes at a time, his recommendations at the end of the same reports were only that plaintiff avoid "prolonged" sitting or standing. (T. 599-600, 596-98).  In December of 2016, Dr. Patel noted normal gait and station. (T. 405).  While Dr. Patel also found restricted range of motion in plaintiff's lumbosacral spine, his ultimate recommendations were, inter alia, that plaintiff avoid straining his back while lifting, and use a lumbar support while sitting or driving. (T. 405-406).

On January 6, 2017, plaintiff's gait and station were normal, and while his lumbosacral range of motion was restricted by pain, his strength and stability were normal, and he had no sensory loss. (T. 501).  Dr. Patel recommended a walking program, taking a break from "work" every two hours, avoid straining while lifting, and using a lumbar support. (T. 501).  Dr. Patel then stated that, even with a modified work program, plaintiff would be unable to "sit or stand" for more than a few minutes at a time. (T. 502).  The recommendation to take a break from work every two hours, while stating that plaintiff could only sit or stand for minutes at a time is arguably internally inconsistent, and as discussed below is inconsistent with the plaintiff's daily activities.

Plaintiff saw Dr. Jenouri on September 6, 2017.[14] (T. 569-72).  Dr. Jenouri noted an antalgic gait, and various limitations on his lumbar spine mobility, but opined that plaintiff had only a "moderate" restriction in walking and standing "long periods," bending, stair climbing, lifting, and carrying. (T. 572).  The ALJ found that his opinion was persuasive and was supported by the evidence and by plaintiff's activity level. (T. 24).  The ALJ also found that Dr. Jenouri's findings were consistent with the RFC to perform light work "with positions changes" as were "contemplated" by the RFC. (*Id.*)

During plaintiff's examination by Dr. Patel on September 6, 2017, plaintiff's gait and station were normal, his lumbosacral range of motion was limited, but his strength and tone were normal.  Plaintiff told[15] Dr. Patel that he had ***no trouble*** concentrating while reading or watching television.  (T. 607).  On September 14, 2017, plaintiff saw a nurse practitioner in Dr. Patel's office who stated that plaintiff ambulated "steady," without an assistive device, and that he had chronic back pain, but denied any other pain, and had full range of motion in his extremities. (T. 605-606).  On October 17, 2018, Dr. Patel stated that plaintiff had some trouble ambulating, the pain was made worse by "prolonged sitting or standing," and plaintiff was unable to sit or stand for "long" periods of time. (T. 602).  At the same time, Dr. Patel stated that plaintiff's pain was so severe that he was unable to do "any" work due to pain. (T. 602).

---

[14] Plaintiff appears to have seen Dr. Jenouri and Dr. Patel on the same day.  Dr. Jenouri noted an antalgic gait while Dr. Patel stated that plaintiff's gait and station were "normal." (T. 570 (Dr. Jenouri), 608 (Dr. Patel)).

[15] This appears in the answer to a patient questionnaire that is part of Dr. Patel's report. (T. 607).

In January of 2018, plaintiff told Dr. Patel that he could not walk more than a few feet at a time without stopping and was unable to stand for more than a few minutes at a time. (T. 599). At the January appointment, plaintiff looked "unwell," and he was sitting leaning over to one side due to the pain, needing to get up periodically during the examination. (T. 600). However, at the end of the report, Dr. Patel stated only that plaintiff should avoid "prolonged" sitting or standing. (T. 600). On March 27, 2018, Dr. Patel noted that plaintiff ambulated with a walker, and that he was under the care of "pain management." (T. 596-97). Plaintiff again looked "unwell," and needed to get up periodically. (T. 597). Dr. Patel recommended heat, weight loss, stretching, and the avoidance of "prolonged" sitting or standing. (T. 598).

In June of 2018, plaintiff was feeling a little better, and Dr. Patel noted that plaintiff was not taking anything for the pain. (T. 592). He was in "no acute distress" and lying comfortably on the stretcher. (T. 593). His extremities had full range of motion, while the range of motion in his lumbosacral spine was limited as before. (T. 593). Straight leg raising was limited due to extreme pain.[16] (T. 593). However, Dr. Patel recommended heat, weight loss, stretching and the avoidance of prolonged sitting or standing. (T. 594).

On October 1, 2018, Dr. Patel stated that plaintiff's back pain was about the same, but he had some improvement with medical marijuana. (T. 589). Plaintiff rated his pain

---

[16] The court notes that when plaintiff was examined by Dr. Thiyagarajah on March 5, 2018, straight leg raising was negative, and he noted that plaintiff's "pain behaviors" were "exaggerated." (T. 630).

at 5 to 6 out of 10 but stated that it was worse because he watched football the day before for 3-4 hours. (*Id.*)  Plaintiff stated that he had occasional numbness but walked "without great difficulty." (*Id.*)  Dr. Patel recommended stretching and stated that plaintiff should avoid prolonged sitting or standing. (T. 590).  On January 2, 2019, plaintiff complained that he had difficulty sitting or standing for more than "a few minutes at a time." (T. 584). Plaintiff had full range of motion in his extremities, and Dr. Patel did not examine the range of motion in plaintiff's low back, but again recommended stretching, weight loss, and the avoidance of prolonged sitting or standing. (T. 587).

The ALJ considered the medical reports in his decision and discussed the persuasiveness of the doctor's opinions. (T. 24-26).  Although an ALJ's RFC determination may not perfectly correspond with any of the medical source opinions cited in his decision, he was "entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record *as a whole.*" *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (emphasis added).  The fact that the MSSs submitted by both Dr. Patel and Dr. Calkins list the time period for their restrictions beginning *2019* and Dr. Patel's statements in one of his reports that plaintiff must alternate positions after one hour, and later in many of his reports, that plaintiff should avoid "prolonged" sitting or standing, supports the ALJ's finding that plaintiff could work if he had the option to sit for 10 minutes after standing or walking for one hour.  This is also consistent with Dr. Jenouri's determination that plaintiff had moderate restrictions, even though the ALJ imposed greater restrictions that Dr. Jenouri contemplated in his report.  The ALJ does not commit error by imposing greater restrictions that those in a consultative medical

report. *See Cheryl T. v. Comm'r of Soc. Sec.*, No. 1:19-CV-1001 (DB), 2021 WL 695100, at *4 (W.D.N.Y. Feb. 23, 2021) (citing *Catalfamo v. Berryhill*, No. 17-CV-0496 (JWF), 2019 WL 1128838, *2 (W.D.N.Y. Mar. 12, 2019) (rejecting argument that ALJ improperly substituted his own lay opinion where the ALJ imposed more restrictions than contained in a medical opinion)).

The ALJ accepted Dr. Calkins's finding that plaintiff could sit for 6 hours in an 8-hour day, although he did not adopt Dr. Calkins's determination that plaintiff would have to change positions every 15 minutes.[17]   The ALJ also found that the plaintiff's ability to lift up to 20 pounds was consistent with Dr. Calkins's statement that plaintiff could "occasionally" lift more than 10 pounds (T. 25, 657) and plaintiff's own testimony.  As stated above, the ALJ must analyze the "consistency" and "supportability" of medical opinion in his determination of the persuasiveness of the opinion.  Dr. Calkins's statement that plaintiff could only be in one position for 15 minutes at a time is arguably inconsistent with Dr. Patel's MSS, with other medical reports in the record, and with plaintiff's activities of daily living, which include taking care of his children, playing computer games, driving, taking his children to their respective practices and competitions, shopping, cooking, and other household chores.

_____

[17] The ALJ did not specifically reject the assessment that plaintiff would have to change positions every 15 minutes, but such rejection is clearly implied when the ALJ stated that Dr. Calkins's assessment of the plaintiff's ability to "sit" for 6 hours was consistent with his stated daily activities, such as watching television, playing video games, role playing Dungeons & Dragons, watching and traveling to his children's sporting events, but did not include a 15 minute sit/stand option. (T. 25-26).

Plaintiff has listed each of his activities separately in a table in his brief and argues that none of the activities alone support the ALJ's finding that plaintiff can sustain full-time work. (Pl.'s Br. at 16-17).  However, it is not just one activity alone, but all plaintiff's daily activities together that are inconsistent with his claim that he is extremely limited, that he must change positions every 15 minutes or that he would be "off task" more than 33% of the day.  The ALJ is entitled to consider the plaintiff's daily activities in his determination. *See Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. Dec. Dec. 18, 2020) (allowing ALJ to consider daily activities in determining consistency with alleged symptoms); *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018); *Roland M. v. Saul*, No. 8:19-CV-1624 (MAD), 2020 WL 7356716, at *4-5 (N.D.N.Y. Dec. 15, 2020).  Daily activities may include the plaintiff's ability to perform work-related functions even though they do not rise to the level of substantial gainful activity. *Rivers v. Astrue*, 280 F. App'x 20, 23 (2d Cir. 2008).

In this case, the ALJ formulated the RFC, considering all the evidence.  The ALJ's determination did not match any of the opinions exactly, but that is not required.  Plaintiff argues that the ALJ could not have determined how long the plaintiff would be able to sit, stand or walk without medical evidence, and that he substituted his own lay opinion for the doctors' reports.  Plaintiff cites *Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) and argues that the ALJ must have "overwhelmingly compelling" evidence to contradict the physicians' findings.  However, the ALJ's finding that plaintiff could stand and walk for one hour and alternate to sitting for 10 minutes is consistent with Dr. Patel's 2016 report which stated that plaintiff could not sit or stand more than one hour *at a time*. (T.

421).  As stated above, while plaintiff's own statements to Dr. Patel were more limiting and many of Dr. Patel's subsequent recommendations stated that plaintiff should be afforded 100% disability,[18] he ultimately recommended that plaintiff should "avoid prolonged" sitting or standing. (*See* T. 587 (Jan. 2, 2019)).  Avoidance of "prolonged" sitting or standing is consistent with sitting or standing one hour at a time and then resting for 10 minutes.  On October 1, 2018, Dr. Patel stated that plaintiff had some occasional numbness in his legs, but he "does walker [sic] amply without any great difficulty." (T. 589).  Plaintiff denied any other "back, neck, or extremity pain," had full range of motion in all extremities, and Dr. Patel again recommended that plaintiff perform stretching exercises for his back and "avoid prolonged sitting or standing." (T. 598, 590).  Conflicting evidence is for the ALJ to weigh. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (court defers to the Commissioner's resolution of conflicting evidence).

---

[18] Dr. Patel did not reference a specific agency when stating a percentage of disability, and in any event, a percentage of disability is not relevant or binding for social security purposes. (T. 26); *See e.g. Fortuna v. Saul*, No. 19 Civ. 11066 (JCM), 2021 WL 961798, at *23 (S.D.N.Y. Mar. 15, 2021) (citations omitted). The court in *Fortuna* noted that it was error to disregard a physician's functional assessment simply because it was rendered in conjunction with an examination for another agency, while recognizing that percentages of disability were not relevant to the social security analysis. *Id.* (citations omitted).  In *Fortuna*, which was decided under the previous treating physician rule, the court remanded because the ALJ did not properly analyze the treating physician's functional assessments in addition to disregarding his percentage disability statements. *Id.* at *23-24. *See also Turcios v. Comm'r of Soc. Sec.*, No. 18-CV-1177 (JS), 2021 WL 84282, at *5 (E.D.N.Y. Jan. 11, 2021) (decided under previous treating physician rule, affirming Commissioner notwithstanding his rejection of portions of the treating physician's determination after giving it "great weight" only to the extent that it was "consistent" with the rest of the record).  The ALJ in this case discussed Dr. Patel's functional analysis and incorporated it in the RFC but noted that the percentage of disability findings were neither "valuable to nor persuasive in" the ALJ's determination for purposes of social security. (T. 26).

Both Dr. Calkins and Dr. Patel found that plaintiff would be "off task" for more than 33% of the day and would be absent from work for more than four days per month. As noted above, both doctors indicated that the time covered by their opinions began in **2019**. (T. 657, 660). The ALJ rejected both of those opinions, because they were inconsistent with plaintiff's activities of daily living, which in addition to performing household functions, included providing child care for several children, one of whom was an infant, taking his children to sports practices and BMX races "all along the east coast," and taking his daughter to cheerleading practice. (T. 25).  The ALJ found that, engaging in these activities, required the plaintiff to "maintain a tight schedule and allows no time to be off task." (*Id.*)

This court has remanded actions in which the ALJ has relied upon daily activities in rejecting off-task and absentee opinions. *See Patrick M. v. Saul*, No. 3:18-CV-290, 2019 WL 4071780, at *10 (N.D.N.Y. Aug. 28, 2019).  In *Patrick M.*, I found that the ALJ selectively referenced plaintiff's statements relative to his ability to stay on task and the nature and duration of his daily activities and that "[t]he Plaintiff's ability to attend medical appointments and engage in other daily activities of limited duration do not correlate to the Plaintiff's ability to stay on-task during an eight-hour work day or the likelihood that he would miss work several days per month because of exacerbations of his chronic back or neck pain." *Id.*

However, plaintiff in this case acknowledged engaging in a more substantial amount of activity, even though he attempted at the hearing to minimize the extent of his activity.  In addition to attending medical appointments, which is not a basis for

determining that he could stay on task or work full-time, he was able to bring his children to their practices and to their competitions on a regular basis,[19] including travel to other cities for competitions, even though he testified that his wife and children helped him load the car.  He cared for his children, including an infant, which involved getting up during the night.[20]  He drove, went shopping, mowed his lawn (albeit in sections), cooked, and socialized with friends playing DND.  This, together with the medical evidence, distinguishes the instant action from cases such as *Patrick M*.  There is no question that plaintiff has limitations, which were considered by the ALJ in his determination of the RFC.

## VII.   Step Five Determination

### A. Legal Standards

If the ALJ utilizes a VE at the hearing, generally, the VE is asked a hypothetical question that incorporates plaintiff's limitations. Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for

---

[19] Plaintiff completed a form in which he stated that he attended his children's races "on a regular basis," 2 x's [sic] per week. (T. 263).

[20] Plaintiff told Dr. Calkins that he was not taking his low-dose Naltrexone because his wife was working, and he had to get up at night to care for his infant. (T. 617).  Low-dose Naltrexone is used to reduce symptom severity in conditions such as fibromyalgia, Chrohn's disease, multiple sclerosis, and complex regional pain syndrome. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3962576/  This medication also has possible anti-inflammatory effects on the central nervous system. *Id.*

vocational expert testimony. *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996). The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion." *Dumas*, 712 F.2d at 1554. *See also Peatman v. Astrue*, No. 5:10-CV-307, 2012 WL 1758880, at *7 n.5 (D. Vt. May 16, 2012) (the hypothetical question posed to the VE must accurately portray the plaintiff's physical and mental impairments) (citations omitted); *Green v. Astrue*, No. 08 Civ. 8435, 2012 WL 1414294, at *18 (S.D.N.Y. April 24, 2012) (citing *Dumas,* 712 F.2d at 1553-54).

### B. Analysis

Plaintiff argues that the ALJ's step five determination is not supported by substantial evidence because the RFC determination was not properly supported, and therefore, the hypothetical question was flawed. Because this court has found that the ALJ arrived at an RFC determination that was supported by substantial evidence, plaintiff's step five argument cannot succeed.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

Dated: March 30, 2021

Andrew T. Baxter
U.S. Magistrate Judge